IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

**RARE BREED TRIGGERS, et al.**
**Plaintiffs.**

  -vs-                                          CASE NO. 1:25cv181-RH-MAF

**BIG DADDY ENTERPRISES, et al.**
**Defendants.**

---

### DECLARATION OF MALCOLM BROWN AND
### ATRIUS DEVELOPMENT GROUP ISO
### DEFENDANTS' RULE 12 MOTION TO DISMISS

---

I, Malcolm Brown, declare as follows:

1. I am competent to make this declaration. The statements contained herein are based upon first-hand knowledge, unless otherwise stated and all statements are true and correct to the best of my knowledge.

**<u>In my personal capacity</u>**

2. I am a resident of Lake Forest, California, where I have lived since 2021. I am not, and have never been, a resident of Florida.

3. I do not own, lease, or control any property, real or personal, in Florida.

4. I do not maintain a mailing address, telephone listing, office, or bank account in Florida.

1

5. I do not have employees, agents, or representatives who reside or work in Florida.

6. I do not advertise or market specifically to Florida, and I do not conduct targeted business activities directed at Florida residents.

7. My only contact with Florida was two trips to BDU which is detailed below.

8. I have not purposefully availed myself of the privilege of conducting activities in Florida, nor have I invoked the benefits or protections of Florida law.

9. I do not have sufficient, continuous, or systematic contacts with Florida. Likewise, I have not engaged in any conduct *in* Florida, giving rise to the claims in this case. I did work as an independent contractor for BDU, who is located in Florida, but all my work was carried out remotely. This is explained in more detail below.

## Atrius Development Group Corp. and other Atrius companies

10. I have set up a number of companies with the name "Atrius" in them. I served as an officer in all of the companies and have authority to speak on their behalf, provided they are still viable, and do so here. For defunct companies, I speak from first-hand knowledge.

11. I established Atrius Energy Co. in California on August 13, 2025, and it is still an active company. Ex. 1E. This company was related to developing energy technology and has no connection to anything related to firearms or triggers.

12. I established Atrius Development Group, Inc. in California on April 29, 2020. This company was dissolved on November 4, 2021. Ex. 1F.

13. I established Atrius Development Group Corp. on November 1, 2021 in Idaho. It was my intent that Atrius–Idaho be a continuation of Atrius–California, but I now understand that I may not have gone about this properly. At that time, I had planned on moving to Idaho and knew the laws of California were not favorable to a corporation in the gun industry. Atrius–Idaho went inactive February 11, 2023. Ex. 1A. This corporation has no assets, as they were transferred to Atrius–Montana.

14. I established Atrius Development Group Corp. on January 24, 2023, in Montana. Ex. 1B. At that time, I had planned on moving to Montana as Idaho had fell through. It was my intent that Atrius–Montana be a continuation of Atrius–Idaho, but I now understand that I may not have gone about this properly.

15. Each time Atrius was moved, all assets were transferred to the new corporation and operations continued seamlessly. In short, I did not realize there was an issue with the manner in which I was changing Atrius' state of incorporation.

16. On, June 20, 2025, Atrius–Montana was converted into a Texas corporation. This conversion was done on advice that Texas state law was likely the most favorable in the U.S., especially with respect to products which increase the rate of fire (e.g., FRT, ART, bump stocks). Ex. 1C. There is a clerical error on the conversion documents appending "Inc." to Atrius Development Group Corp. which is redundant.

17. While in Montana, Atrius Development Group Corp. used an assumed business name (d/b/a) of Atrius Triggers from October 31, 2023 to December 1, 2024. Ex. 1D.

18. None of my companies has ever had an office or facility or employees in the state of Florida. Nor have any ever been headquartered or conducted business targeted business activities directed at Florida residents. I have never worked in Florida, but did some work for BDU, a Florida company, as described in detail below. Also as explained in more detail below, my work was carried out remotely from California with the exception of two visits to BDU.

**Atrius–Idaho (ART Design)**

19. While working as an engineer in the firearms industry, I became interested in developing an FRT, as I saw some of them coming to market. The FRT's being marketed did have a disconnector which the ATF did not like. The ATF took the position that these FRT's were illegal machine guns. So, I wanted to develop an FRT which contained a disconnector in the hopes the ATF would not have an issue with it. One such FRT sold by Tac Con, received ATF approval. I also wanted my FRT to have 3-position selector

which would allow the shooter safe, semi-automatic, and FRT modes. The FRT's on the market, at that time, only offered safe and FRT modes.

20. So, I contacted Tony McKnight of BDU, around late October of 2021, to see if he might have an interest in having me develop a new FRT. He expressed interest in my idea and stated he would consider licensing a patent on an FRT design that would not infringe upon the '223 patent.

21. I also contacted Lawrence DeMonico of RB to speak to him about possibly licensing my idea. He informed me that RB had the '223 patent and stated he if sent him my design, he would make an infringement determination. This set off a red flag for me to avoid the '223 patent in my design, and I wasn't about to send him my confidential design without an NDA in place.

22. On November 8, 2021, Atrius–Idaho entered into a patent licensing agreement with BDU. Arius was to develop an FRT that would avoid the '223 patent, contain a disconnector, and have a 3-position selector switch. Atrius would patent the design and license BDU. BDU would be responsible for commercialization of the idea (i.e., manufacture, sales, and marketing).

23. As part of the agreement, Atrius–Idaho warrants that its design will not infringe upon someone else's patent. When the design was complete, I did obtain a non-infringement opinion from an attorney.

24. For my trigger design work and subsequent patent license, BDU sent Atrius–Idaho a payment in March 2022 to my wife's bank account, as I had not yet set up a business account for Atrius–Idaho.

25. In December 2021, I visited Mr. McKnight just to meet him in person, and we had dinner together.

26. Around that time, I learned that RB sued Tommy Triggers on '223 patent for selling an FRT with a 3-position safety selector switch, as this was similar to what I was doing, I looked into their design to ensure my design differed and was even further from the '223 patent. This again highlighted, to me, the need to ensure my design was not going to infringe upon the '223 patent.

27. My design ultimately was *not* a FRT, rather it was an assisted reset trigger ("ART"); this was one of the design elements I incorporated to avoid the '223 patent. The '223 patent requires the bolt carrier reset the trigger *fully*.

4

This was done to avoid the prior art which disclosed a partial or assisted reset from the bolt carrier.

28. By September 2022, I felt I had a good working design which was dubbed the ART trigger. However, BDU seemed to be struggling financially due to a lawsuit with RB.

29. So, after some soul-searching, I made the decision to move forward with the trigger design and manufacture it myself, as I felt uneasy about depending on BDU for funding. So, we reached an informal agreement where Atrius–Idaho would be responsible for manufacturing the trigger and BDU would just be a non-exclusive distributor. I understand that at some point BDU filed bankruptcy or went defunct, so I am using "BDU" loosely as my interaction with Mr. McKnight could have him been him acting in his personal or on behalf of some other company that he ran.

30. As it was my foray into manufacturing, the learning curve was steep and time consuming. In short, Atrius–Idaho never manufactured any trigger. However, I continued my efforts through Attrius–Montana. By this time, Atrius–Montana was funding the cost of developing an ART trigger for market. Mr. McKnight was waiting for a commercial product that he could sell.

**Atrius–Montana/Texas**

*ART Commercial Product*

31. Atrius-Montana continued working on its manufacturing efforts which culminated in 5 sample triggers on or about February 17, 2023.

32. A period of testing and tweaking the design and manufacturing process ensued.

33. On or about June 9, 2023, Atrius-Montana received revised 5 sample triggers.

34. On or about July 20, 2023, I visited Mr. McKnight in Gainsville. It was primarily a glad-handing meeting I did, while visiting a personal friend of mine. It was during this visit that I first met Mr. Rios, but his role at BDU wasn't clear to me. We did discuss our business plans, but I did not carry out any design or manufacturing work while in Florida.

35. I continued testing and tweaking continued, until I was satisfied.

36. The ART triggers hit the market around May 2024. This was a trial run of some 500 triggers. These triggers were sold by Atrius–Montana.

37. The ART design turned out to be problematic, and we had about 250 triggers returned for refunds. The triggers being an assisted reset ("ART"), rather than a forced reset ("FRT"), was the fundamental source of the issue.

38. I understand that RB contends, the ART is the same as, works the same way as, and infringes upon the '223 patent. This is not true. For example, the '223 requires the hammer to reset the trigger completely; they limited the patent claims in that way to avoid prior art. In my design, the trigger is not reset completely, only partially. In fact, it was called ART for assisted reset trigger to differentiate it from a forced reset trigger (meaning fully reset). The ART contains a disconnector, the '223 patent does not which it points out explicitly. The ART also has a 3-position selector switch the '223 patent does not. RB later obtained a patent over the '223 patent on the basis that it combined a 3-position selector switch with an FRT. I don't see how the combination of an FRT with a 3-position selector can be patentable, while the same combination can be "substantially similar" to the Alamo-15. If the latter were true, the former would be obvious.

39. I had filed a provisional patent application on the ART which I believe is patentable over the '223 patent. However, given its failure as a commercial product, I did not pursue obtaining a patent.

40. During the time I worked with BDU, I knew the case against RB was on-going, but I didn't have specific information on the case. At no time was I informed by anyone of any injunction, and I did not have knowledge of any injunction prior to this case. However, as I understand the injunction, it would not apply to the design of an FRT nor would it apply to an ART or a safety selector or anything else not "substantially similar" to the Alamo-15 or WOT.

41. All of my work with BDU was carried out in California with the exception of the two trips to BDU mentioned above.

42. After the ART trigger with BDU, Atrius did not have any further working relationship with BDU. BDU is free purchase product from Atrius, but it has no special relationship or input into design or manufacturing.

*Super Selekto*r

43. Around July of 2023, Hoffman Tactical released a Super Safety design and rather than patent it, it released the design for free download on-line. In a short period of time, many people were making and selling Super Safety selectors.

44. The Super Safety is *not* a trigger, but rather a safety selector switch. As such, it does not remotely infringe upon the '223 patent. In fact, Rare Breed has sued several of Super Safety manufacturers/sellers for patent infringement, it has never asserted the '223 patent against any of them for the Super Safety.

45. The Super Safety gave me the idea to develop a safety selector switch, as opposed to a trigger. I didn't like the Super Safety design because required the user to modify a standard, mil-spec trigger to work in conjunction with it. In essence, the trigger had to have a portion ground off the back end. I wanted a safety selector that would work with a standard trigger.

46. My first design was dubbed the Atrius Select Fire FRT and it was completed around the Fall of 2023. BDU did promotional video for the proposed product. I understand Mr. DeMonico contacted Mr. McKnight warning him that he was causing unwanted attention from the ATF. Mr. DeMonico never expressed any concern that the Select Fire FRT infringed upon any of RB's patents.

47. Ultimately, I was not satisfied with the design of the Atrius Select Fire, so I later developed the Super Selektor. Atrius began selling these safety selectors on May 16, 2025, and continues selling them presently.

48. I have been informed that RB contends, the Super Selektor is similar to and infringes the '223 patent. First, RB has never contacted me with patent infringement concerns, despite Mr. DeMonico's warning that he would be watching to ensure Atrius' products did not infringe RB's patents. Second, I have a non-infringement opinion on the Super Selektor. Third, the Super

Selektor is *not* a trigger nor does it have most of the elements claimed by the '223 patent (e.g., trigger, housing, or safety bar).

**Atrius relationship with Mr. McKnight and Mr. Rios**

49. To be clear, the only role Mr. McKnight played in the development efforts of what eventually came to be known as the ART, was that he funded a portion of the early development of the conceptual and patentable design of the trigger.

50. Mr. McKnight did not participate in the design of the ART, he merely provided partial funding for a design around the '223 patent. He had no role in the manufacturing of the ART. He was merely a non-exclusive dealer of the ART.

51. Mr. Rios had no role in the ART, of which I am aware. I met with Mr. Rios, during my visit at BDU, but his role at BDU and whether he had any role with the ART remain unclear to me. I really did not begin speaking with Mr. Rios, until the Super Selektor was designed.

52. The first I became aware of an injunction against Mr. Rios and Mr. McKnight was after this lawsuit was brought. Atrius will proceed with continued sales of its products to Mr. McKnight or Mr. Rios, only after obtaining clearance with its lawyers.

**My wife, Lea Brown f/k/a Andreoli**

53. My wife, Lea Brown, who's maiden name is Andreoli, was a registered nurse and now a stay at home mom. She has never been involved with my business or business activities.

54. I used her bank account to accept two payments related to Atrius–Idaho. The reason for this was that I have been banking with USAA, since my military days, and USAA does not have brick-and-mortar branches near my house. As I had not previously received business related deposits for Atrius–Idaho, I had not set up a business account. Shortly after receiving the two payments, I did set up a business account which handles all my business transactions. One of the two payments that went to my wife's account was from BDU, the other was wholly unrelated to BDU.

55. I have been told that RB contends that Lea Brown's account is in her maiden name in an effort to conceal her identity. This contention is not true, but also makes no sense. Banking records aren't public, so her identity as it relates to a specific bank account is already concealed. She opened the account prior to marrying me and just never updated her name.

56. Attached to this declaration are corporate records I downloaded from the Secretary of State websites from the states of California, Idaho, Montana, and Texas. Exs. 1A–1F. These are accurate and true copies.

**Response to RB's Complaint Allegations**

57. RB alleges without any support, that I directed the design and sale of infringing triggers through a Florida-based infrastructure. Dkt. 1 at ¶ 17. First, designing a product does not constitute patent infringement ever. If the "Florida-based infrastructure" is BDU, I did sell the ART to BDU for resale; Atrius did not "direct" BDU nor did BDU "direct" Atrius; these are two separate and completely unrelated companies. The manufacture of the ART and Super Selektor was done through Atrius Montana/Texas. Only design work was carried out by Atrius-Idaho. The ART does not infringe the '223 patent nor is it substantially similar to the Alamo-15 or WOT triggers.

58. RB alleges I, my wife, and Atrius "knowingly participated in and facilitated the breach of the Settlement Agreement." *Id.* at ¶ 37. We had no knowledge of "the Settlement Agreement" or of its terms, until after this suit was filed. My wife still has no knowledge of it. While Mr. McKnight did tell me that the Florida case with RB had settled, he stated the terms were strictly confidential. That was the extent of what I knew, and I had no reason to go check court records. BDU's suit with RB was not my business nor my concern.

59. RB defines an FRT as "any fire control group where movement of the action causes the trigger member to be forced to the fully reset position." *Id.* at ¶ 45(b). The ART did not force a full reset, and Super Selektor is not even a fire control group, it's a safety selector switch.

60. RB makes vague allegations that Atrius is a "proxy entity" and used to conceal identities and avoid detection. *Id.* at ¶¶ 51–52. All of my Atrius Corporations have my name associated with them. My website is clearly

9

"Atrius." I've made no effort to hide my identity; I have nothing to hide. The triggers I have designed and made do not infringe upon RB's patent which is why it has sued me under a twisted theory of breach of contract rather than patent infringement.

61. RB alleges that from 2021–2023, that I designed a three-position FRT (which was the ART), while a preliminary injunction was in effect. At the time, I had no knowledge of a preliminary injunction. *Id.* at ¶ 58. I understand that designing a product never constitutes patent infringement. In addition, the ART is not an FRT and does not infringe the '223 patent. Furthermore, RB's claim that Mr. McKnight and Mr. Rios worked with me to develop and finalize the ART is incorrect. *Id.* at ¶ 60. Mr. McKnight engaged me as an independent contractor to develop a non-infringing alternative to the '223 patent. Mr. Rios was, to my knowledge, not involved.

62. RB falsely claims that Atrius advertised the ART as an FRT. *Id.* at ¶ 62. First, the fact that the ART is not an FRT, is in the very name of the product, it is an Assisted Reset Trigger. Second, Atrius never marketed the ART as an FRT; it was always marketed as an ART, lacking full trigger reset.

63. RB also falsely claims Atrius sold 9,000 ART trigger for $1.8 million. *Id.* at ¶ 64. I have no idea where they arrived at these numbers. The ART was not a successful product, I wish I had $1.8 million in sales, but unfortunately, this did not happen. In addition, RB's math does not equate, as 9,000 ART triggers at $500 would be $4.5 million.

64. RB claims the Defendants (which presumably includes Atrius and myself) worked in a coordinated fashion with "interlocking directorships," domains, etc. to assist and conceal Settling Defendants' fraud. *Id.* at ¶¶ 158–163. Speaking for Atrius and myself, I did not know about any "fraud" by BDU nor did I assist with any such thing. I did nothing to hide my identity or the identity of Atrius. Mr. McKnight has no role and never has in any of my businesses. He was merely a customer initially wanting a design around the '223 patent and later a distributor of product.

**Response to Mr. DeMonico's Allegations**

65. Mr. DeMonico falsely claims the ART operates in the same way as the FRT-15. Dkt. 54-1 at ¶ 27. Contrary to his description, the ART is not designed to reset the trigger fully. He claims that a shooter can simply tighten the

adjustment screw all the way down to turn it from an ART to an FRT. First, this would likely cause the trigger to malfunction and could be dangerous. Second, he admits that the ART has a substantial non-infringing use, and if used as marketed, it does not infringe the '223 patent.

66. Mr. DeMonico claims that seeing the ART next to the Alamo-15 "is revealing." *Id.* However, he merely shows the triggers fully assembled next to each other. Frankly, if you placed RB's FRT-15 next to a standard AR-15 drop-in trigger it would look the same to a lay person. You have to compare the internal mechanisms, when comparing triggers. For example, the ART includes a disconnector, whereas the Alamo-15, RB's FRT-15, and the '223 patent do not. The ART works with a 3-position selector switch, whereas the Alamo-15, RB's FRT-15, and the '223 patent do not. That difference alone, was represented to the USPTO as a worthy of a patent. The ART is an assisted reset trigger, whereas Alamo-15, RB's FRT-15, and the '223 patent are full reset triggers. This difference was represented to the USPTO as a patentable distinction leading to the issuance of the '223 patent.

67. Mr. DeMonico misrepresents that the Atrius ART was being sold as "Atrius Select Fire FRT." *Id.* at ¶ 43. The very webpage he points to states it's "Atrius Select Fire Assisted Reset Trigger." Its states the ART "significantly reduces trigger reset," not that it eliminates altogether which directly contradicts his statement.

68. Mr. DeMonico's position that the Super Selektor is an FRT and a "fire control group" is laughable. No gunsmith or even a remotely educated gun enthusiast would describe a safety selector switch as a forced reset ***trigger*** or a fire control group.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 26, 2025

DocuSigned by:
*malcolm Brown*
FC113EF0476147C...
Malcolm Brown