## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

| | |
|---|---|
| RARE BREED TRIGGERS, INC., a Texas corporation, | Case No. 1:25-cv-00181-RH-MAF |
| *Plaintiff*, | |
| v. | |
| BIG DADDY ENTERPRISES, INC., *et al.*, | Judge Robert L. Hinkle |
| *Defendants*. | Magistrate Judge Martin A. Fitzpatrick |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12

Although Defendants go to great lengths to deny their involvement, Plaintiff Rare Breed Triggers, Inc. ("RBT") alleges—and third-party discovery confirms—that this Court has jurisdiction over Defendant Atrius Development Group Corp. ("Atrius"), Defendant Malcolm Brown ("Brown"), and Defendant Lea Andreoli ("Andreoli").

First, this Court has subject matter jurisdiction over Defendant Atrius-Idaho because it is a distinct legal entity from Atrius-Texas and therefore diverse from RBT. The citizenship of a corporation is determined at the time of filing, and dissolved corporations retain their state of incorporation as their sole citizenship for diversity purposes. Idaho law makes clear that dissolution does not terminate a corporation's existence or bar suit in its corporate name, and conversion to another

state requires compliance with statutory procedures that Defendants have not shown occurred. RBT sued Atrius-Idaho and served its Idaho representative, and no evidence suggests that Atrius-Idaho ever validly converted into a Texas entity. Accordingly, Atrius-Idaho remains a proper defendant, and its citizenship preserves complete diversity in this action.

Second, specific jurisdiction exists over Defendants Brown and Andreoli because they purposefully participated in a Florida-centered scheme that gives rise to RBT's aiding and abetting fraud claim. Brown worked in concert for years with Defendant Big Daddy Unlimited ("BDU") and Defendants Anthony McKnight and Douglas Rios. He executed a patent agreement governed by Florida law that contains a Florida arbitration clause. He traveled to Gainesville to advance the prototype and then continued the work by accepting CAD (computer-aided design) files, prototypes, and testing feedback sent from Florida while transmitting progress videos back to Florida. He caused payments originating from Florida to be routed into Andreoli's account, rather than an Atrius account or his own personal account, to conceal his involvement. Andreoli knowingly served as the payment conduit and helped transmit prototype updates into Florida, tying her conduct to the same forum-directed enterprise.

These are not incidental contacts. They are the engine of the aiding-and-abetting fraud claim and demonstrate Brown and Andreoli's deliberate affiliation

with Florida. To clarify, earlier filings grouped Atrius, Brown, and Andreoli as the "Atrius Defendants" only because they were the first Defendants to appear and file motions in this action. But in substance, Brown has long operated in lockstep with BDU; and Atrius, Brown, and Andreoli are more accurately understood as part of the BDU cohort for jurisdictional and merits purposes, as their conduct is intertwined with BDU's Florida-based operations.

Fourth, if the Court perceives any subject matter issue tied to Defendant Atrius's citizenship, the case can proceed without Atrius because Atrius is a dispensable party under Rule 21 that may be dismissed without prejudice to the existing parties, while still allowing complete relief against the signatories to the Settlement Agreement and Brown and Andreoli. RBT's core claims are breach of the Settlement Agreement, breach of the implied covenant, and fraud against those who signed the Settlement Agreement and are bound by the Consent Judgment. Atrius signed neither instrument. The sole claim asserted against Atrius is aiding and abetting fraud, which is analytically distinct and unnecessary to award full damages and injunctive relief against the signatories already before the Court, and which is also levied against Brown and Andreoli. Any potential prejudice can be avoided by shaping relief, and RBT can pursue Atrius separately under an alter-ego theory in an appropriate forum, without risking inconsistent obligations on the settlement-based claims or those against Brown and Andreoli.

Fifth, and alternatively, this Court can exercise ancillary jurisdiction even if Atrius is somehow deemed a Texas citizen. Ancillary jurisdiction does not require the parties to be diverse.

Accordingly, as explained below, Defendants' motion to dismiss should be denied.

## FACTUAL BACKGROUND

On July 1, 2025, Plaintiff Rare Breed Triggers, Inc. ("RBT") filed this action against Defendants Big Daddy Enterprises, Inc. ("BDE"), Big Daddy Unlimited, Inc. ("BDU"), Blackstock, Inc., Wide Open Enterprises, LLC, We Got Ammo, Inc., Performance Triggers Inc., Atrius Development Group Corp. of Idaho ("Atrius-Idaho"), Delta 7 LLC, C&C Holdings Group LLC, Anthony McKnight, Sherrie McKnight, Douglas Rios, Christopher Rios, Malcolm Brown, Lea Andreoli, and Andrew Myers (collectively, "Defendants").

RBT's claims in this litigation can be broken down into two categories: **(1) breach of contract and fraud claims** against Defendants BDU, BDE, Blackstock, Wide Open Enterprises, We Got Ammo, Anthony McKnight, Sherrie McKnight, and Douglas Rios (the "Settling Defendants") for violating the parties' October 19, 2022 Settlement Agreement (the "Settlement Agreement") with RBT; fraudulently inducing RBT to enter into the Settlement Agreement; fraudulently concealing their violations of the Settlement Agreement; and fraudulently misrepresenting

their compliance with the Settlement Agreement, *see* ECF 1 ¶¶ 124–151; and **(2) aiding and abetting fraud claims** against Defendants Atrius-Idaho, Performance Triggers, Delta 7 LLC, Christopher Rios, Malcolm Brown, Lea Andreoli, and Andrew Myers for knowingly assisting the Settling Defendants in fraudulently concealing their violations of the Settlement Agreement. *See id.* ¶¶ 152–164.

When RBT filed the Complaint, it alleged that the "Atrius" it knew to be controlled by Defendant Brown—and affiliated with Defendants BDU, Performance Triggers, Anthony McKnight, and Douglas Rios, among others—was an Idaho corporation ("Atrius-Idaho"). *See* ECF 1 ¶¶ 18, 26. RBT made this determination based on the information it learned about Atrius when it first began to engage in the tortious conduct outlined in the Complaint, between 2021 and 2023. *See* ECF No. 1 ¶¶ 56–60; Declaration of Lawrence DeMonico ("DeMonico Decl.") ¶ 2. When RBT reviewed Atrius-Idaho's filings with the Idaho Secretary of State's Office prior to filing suit, it noticed that Atrius-Idaho had been dissolved on February 11, 2023. *See* ECF 96-2. However, there was no indication that Atrius-Idaho filed Articles of Conversion to incorporate under the laws of another state, as required under Idaho state law. *See* Idaho Code Ann. §§ 30-22-401 *et seq.* Accordingly, RBT sued Atrius-Idaho. *See* ECF No. 1 ¶¶ 18, 26.

And after being served through its registered agent in Boise, Idaho on July 7, 2025, Atrius-Idaho accepted service and entered an appearance. ECF No. 39. It

then moved to compel arbitration without challenging diversity jurisdiction or asserting citizenship outside of Idaho or California. ECF No. 49.

On August 13, 2025, during oral arguments on Defendants' motions to compel arbitration, Atrius-Idaho—for the first-time—asserted that Atrius had converted its incorporation to Texas. Upon further inspection, however, it appears that another Atrius incorporated in Montana on January 24, 2023 ("Atrius-Montana"), was the entity that converted to a Texas corporation. ECF Nos. 96-3, 96-4. Although Atrius-Idaho, Atrius-Montana, and Atrius-Texas all reference the same California address, this is no evidence that the entity Atrius-Idaho—the party that RBT sued and served via its registered agent in Boise, Idaho—ever converted its state of incorporation to Montana. Therefore, Atrius-Idaho and Atrius-Texas (formerly Atrius-Montana) should be considered as two separate legal entities. At a minimum, Atrius-Texas has not been served with process or entered an appearance, and is not a party to this action. ECF No. 96 at 4-5.

On August 27, 2025, Defendants Malcolm Brown, Lea Andreoli, and Atrius-Idaho (collectively, "Moving Defendants") moved to dismiss Brown and Andreoli on the grounds that this Court cannot exercise personal jurisdiction over them; to dismiss Atrius-Idaho on the grounds that the Court cannot exercise subject matter jurisdiction because it is the same entity as Atrius-Texas and therefore is a nondiverse party; and to dismiss the entire action on the grounds that Brown,

Andreoli, and Atrius-Idaho are indispensable parties and the action could not proceed without them should they be dismissed on personal jurisdiction or subject matter jurisdiction grounds. *See* ECF 100, Defendants' Motion to Dismiss Pursuant to Rule 12 ("Defs. Mot.").

Although Moving Defendants downplay key allegations, RBT's Complaint details how Defendants Brown and Andreoli aided and abetted the Settling Defendants' fraud and support this Court's exercise of specific personal jurisdiction over them. For Brown, RBT alleges that he "directed the design and sale of infringing triggers through Florida-based infrastructure, knowingly assisted the Settling Defendants in evading the Settlement Agreement, and worked in concert with them to continue sales," ECF No. 1 ¶ 17; that his fraudulent conspiracy with Florida residents McKnight and Rios began as early as 2021 and continued after entry of the Settlement Agreement and Permanent Injunction, ECF No. 1 ¶¶ 59–66, 76–79; and that he personally appeared in a November 2023 promotional video for the Atrius Select-Fire Assisted Reset Trigger. ECF No. 1 ¶ 79. For Andreoli, RBT alleges that she knowingly acted as the conduit for payments from BDU by receiving funds into her personal account to conceal Brown's role and thereby further the fraudulent scheme. ECF No. 1 ¶¶ 17, 59, 158–63.

Moreover, limited third-party discovery has corroborated RBT's allegations and, in material respects, strengthened them with previously unknown details about Defendants Brown and Andreoli's business relationship with the Settling Defendants. *See* DeMonico Decl. ¶ 3. Specifically, documents obtained from former BDU employee Omar Zumot have shown that Brown executed a Patent Agreement with BDU, governed by Florida law and containing a Florida arbitration clause, *see* DeMonico Decl. ¶¶ 5–7, Exs. A-D; traveled to Gainesville for a two-day working session, *see id.* ¶¶ 11–12, Ex. G; received CAD files, prototypes, and design instructions directly from Florida, *see id.* ¶¶ 21–22, Exs. J–P; and routed royalties into Andreoli's account, including three payments of $20,000 each, totaling $60,000. *See id.* ¶¶ 13–16, Ex. H. These documents have also shown that Andreoli repeatedly received BDU transfers into her account, helped transmit prototype update videos from Brown to BDU in Florida, and paid Atrius business expenses from her personal account. *See id.* ¶¶ 13–17, Exs. H, I. Brown, too, received wires into his personal account for Defendants, with 12 separate payments from Performance Triggers totaling over $120,000. *Id.* ¶ 19.

This third-party discovery calls into question whether Defendants Brown and Andreoli have been completely forthcoming in their representations, and whether their statements carry enough credibility to have any evidentiary value at all. The table in the DeMonico Declaration highlights some of Brown and

Andreoli's representations that are directly contradicted by documentary evidence. *See* DeMonico Decl. ¶¶ 24A–24J.

As detailed below, RBT's allegations and the evidence obtained thus far in discovery demonstrate that Brown and Andreoli are subject to jurisdiction under Florida's long-arm statute, and that each have sufficient minimum contacts with the state to satisfy the requirements of the Due Process Clause.

## ARGUMENT

**I.     This Court has subject matter jurisdiction over Defendant Atrius-Idaho because it is a distinct legal entity from Atrius-Texas, and thus is diverse from RBT.**

The citizenship of a corporation is "determined at the time the complaint was filed." *Holston Invs., Inc. B.V.I. v. LanLogistics Corp.*, 677 F.3d 1068, 1070 (11th Cir. 2012) ("*Holston*"). Dissolved corporations are deemed to be citizens of the state where they are incorporated. *Id.* at 1071. Unlike active corporations, dissolved corporations are deemed not to have a principal place of business that can serve as a basis for citizenship. *Id.*

Under Idaho law, dissolution does not terminate a corporations existence or "prevent the corporation from being sued in its corporate name." *Wait v. Leavell Cattle, Inc.*, 41 P.3d 220, 222 (Idaho 2001) (citing Idaho Code Ann. § 30-1-1405 (now codified at Idaho Code Ann. § 30-29-1405)). To become incorporated in another state, an Idaho corporation must file for conversion of the domestic

corporation to a foreign state, as set forth in Idaho Code Annotated §§ 30-29-901 *et seq.*

Here, RBT sued Atrius-Idaho, which it served through its corporate representative in Boise, Idaho. Although Atrius-Idaho was dissolved, there is no evidence to suggest that it filed articles of conversion to change its state of incorporation, as required under Idaho law. *See* Idaho Code Ann. §§ 30-29-901 *et seq.* Thus, the existence of Atrius-Idaho never terminated, and RBT is free to sue it in its corporate name. *See Wait*, 41 P.3d at 222. That Atrius-Idaho was dissolved does not alter this analysis. *See Holston*, 677 F.3d at 1071. Brown provides no form of asset sale contract. While Brown declares that the assets from Atrius-Idaho were transferred to Atrius-Montana, it evidently was not done pursuant to Idaho law.

Accordingly, RBT has made a prima facie showing that Atrius-Idaho is a proper Defendant to this litigation. Because it is a citizen of a state other than Texas, where RBT is incorporated, its presence in this litigation does not destroy complete diversity. Since RBT has made this prima facie showing, the burden shifts to Defendants to establish that Atrius-Texas[1] is not a different entity than Atrius-Idaho for juridical purposes.

---

[1] Interestingly, while Brown declares that Texas laws are more favorable to Atrius-Texas, this cuts against Atrius Defendants' argument that Brown did not produce an FRT. Of course, a Texas federal court ruled that FRTs are not machineguns over the

And Defendants have not carried that burden. The Court predicted in its August 20, 2025 Order that Atrius-Idaho and Atrius-Montana are separate corporations, and that RBT intended to name Atrius-Idaho as Defendant. ECF No. 96 at 4. That prediction has come to fruition with Atrius's principal, Defendant Malcolm Brown, admitting that Atrius-Idaho was never converted to Atrius-Montana and therefore was never converted to Atrius-Texas. ECF No. 100-1 ¶¶ 13–15 (Malcolm Brown admitting that while it was his "intent that Atrius–Montana be a continuation of Atrius–Idaho, [he] now understand[s] that [he] may not have gone about this properly"). In other words, Atrius-Idaho remains an Idaho corporation, as pled by RBT in its Complaint, so this Court retains subject matter jurisdiction.

## II. This Court has personal jurisdiction over Defendants Brown and Andreoli because their direct participation in a fraudulent scheme centered in Florida satisfy the requirements of Florida's long-arm statute and the Due Process Clause.

To determine whether it may exercise personal jurisdiction over an out-of-state defendant, federal courts sitting in diversity conduct a two-part analysis: first, they "ask whether the exercise of personal jurisdiction falls under the state's long-arm statute, and second, whether it comports with the Due Process Clause of the

---

ATF's illegal attempt to classify them as such. It is obvious that Atrius-Texas seeks protection under that Texas federal court ruling, its protestations notwithstanding.

Fourteenth Amendment." *ECB USA, Inc. v. Savencia Cheese USA, LLC*, No. 23-12580, 2025 WL 2471541, at *3 (11th Cir. Aug. 28, 2025) ("*ECB*").

Under Florida's long-arm statute, a court may exercise specific jurisdiction over a defendant who "commit[s] a tortious act within [the] state." *ECB*, 2025 WL 2471541, at *3 (citing Fla. Stat. Ann. § 48.193(1)(a)(2)).[2]

To exercise specific personal jurisdiction, the Due Process Clause requires a nonresident defendant to have sufficient "minimum contacts" with the forum state. *ECB*, 2025 WL 2471541, at *3 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). A defendant's minimum contacts are established when (1) the plaintiff's claims "arise out of or relate to" the defendant's contacts with the forum state, (2) the defendant has "purposefully availed" itself of conducting business within the forum state, and (3) exercising jurisdiction comports with "traditional notions of fair play and substantial justice." *Id.* (internal quotations and citation omitted); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, n. 18 (1985) ("So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction"). The plaintiff must establish the first two elements, after which the burden shifts to the defendant to show that exercising jurisdiction would be unfair. *Id.* (citation omitted). "[W]here the plaintiff's

---

[2] Defendants chose not to address Florida's long-arm statute and therefore have waived that argument. *See Ivy v. Ford Motor Co.*, 646 F.3d 769, 773 (11th Cir. 2011) (deeming argument waived if not raised in brief).

complaint and the defendant's affidavits conflict, the district court must construe all reasonable inferences in favor of the plaintiff." *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990) (deciding a motion to dismiss for lack of personal jurisdiction).

Allegations of aiding and abetting fraud committed by entities or individuals based in Florida are sufficient to establish minimum contacts with the state. In *Energy Source, Inc. v. Gleeko Props., LLC*, nonresident actors were sued alongside Florida co-defendants for a coordinated scheme in which a Florida signatory executed the operative agreement, substantial funds were placed into escrow in connection with the transaction, and those funds were disbursed and retained by participants—allegedly as part of an ongoing fraudulent conspiracy tied to Florida. *Energy Source*, 2011 WL 3236047, at *1–2. On these facts, the court held that "the Florida long-arm statute confers personal jurisdiction over [the nonresident defendants] . . . and the exercise of jurisdiction over these [defendants] would not violate the Due Process Clause of the Fourteenth Amendment." *Id.* at *7.

In so holding, the court explained that Florida's long-arm statute conferred jurisdiction over the nonresident defendants because "a defendant's physical presence is not required in order to 'commit a tortious act in Florida,'" and importantly, because "Florida law construes the state's long-arm statute to reach **all of the alleged participants in a civil conspiracy**, at least one act in furtherance

of which is committed in Florida." *See id.* at *6 (emphasis added). The court further reasoned that exercising jurisdiction comported with Due Process, as "[t]he Eleventh Circuit has held that allegations of intentional torts"—including conspiracy to commit fraud—"satisfy the 'minimum contacts' requirement and support the exercise of personal jurisdiction over a nonresident defendant with no other contacts with the forum." *See id.*

Here, RBT's Complaint and limited discovery establish that Brown and Andreoli engaged in tortious conduct directed at Florida that satisfy the requirements of Florida's long-arm statute and the minimum contacts test. Indeed—in the context of their argument that Atrius, Brown, and Andreoli are "indispensable parties"—Defendants concede that the Complaint "place[s] Atrius, Brown, and Andreoli at the **heart of the controversy**" and alleges that they were "**central participants** in the alleged scheme to design, market, and conceal the sale of the so-called Atrius FRT and to facilitate the Settling Defendants' alleged breach of the Settlement Agreement and violation of the Permanent Injunction." *See* Defs. Mot. at 18 (emphasis added).

### A.   This Court has personal jurisdiction over Defendant Malcolm Brown.

Specifically, RBT alleges that Brown "directed the design and sale of infringing triggers through Florida-based infrastructure, knowingly assisted the Settling Defendants in evading the Settlement Agreement, and worked in concert

with them to continue sales." Compl. ¶ 17. It further alleges that Brown's fraudulent conspiracy with Florida residents and co-Defendants McKnight and Rios began as early as 2021; that in January 2022, Brown took payment for developing a three-position FRT routed through Andreoli's account; that the collaboration continued after the September 2022 Settlement Agreement and October 2022 Permanent Injunction; that by December 2023, Atrius—under Brown's direction—was marketing and selling the Atrius Select-Fire Assisted Reset Trigger; and that on November 11, 2023, BDU released a promotional video for the Atrius Select-Fire Assisted Reset Trigger featuring Brown personally demonstrating the product. Compl. ¶¶ 59–66, 76–79.

RBT's allegations regarding Brown have been corroborated by its limited discovery thus far—specifically, third-party productions from BDU's liaison, Omar Zumot. On or around November 8, 2021, Brown entered into a Patent Agreement with BDU (acting through Florida based Defendants Anthony McKnight and Douglas Rios) that governed production of the products RBT alleges violate the Settlement Agreement. *See* DeMonico Decl. ¶¶ 5–7, Ex. A.[3] The Patent Agreement between Brown and BDU selected Florida law to govern and

---

[3] In response to a declaration by a defendant challenging personal jurisdiction, the plaintiff is entitled and required to "produce evidence supporting jurisdiction." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013). RBT does that here with the DeMonico Declaration and its exhibits.

included a Florida arbitration clause.[4] *See id.* Within weeks after Brown signed the

Patent Agreement, BDU flew him to Gainesville for a two-day working trip to

advance the prototype,[5] after which the first wire to Andreoli's account was

arranged. *See id.* ¶¶ 11–15, Exs. G, H. From Florida, BDU continuously directed

Brown's design work—supplying computer-aided design ("CAD") files and

samples; issuing feedback and specific design instructions; coordinating

prototypes, 3-D prints, and tests; and receiving Brown's frequent updates on his

progress. *See id.* ¶¶ 21–23, Exs. J–Q. The same productions confirm that Brown

routed payments from BDU into Andreoli's account. *See id.* ¶¶ 13–15, Ex. H.

Brown also received at least 12 payments from Defendants totaling at least

approximately $122,500. *See id.* ¶ 19.

Applied here, Brown's conduct falls squarely within Floria's long-arm

statute. Fla. Stat. § 48.193(1)(a)(2). He partnered with Florida entities and residents

---

[4] This fact shows that Defendants' claim that Brown has never "entered into contracts in Florida" is unequivocally false. *See* Defs. Mot. at 9. Further communications between Brown and Zumot indicate the royalty percentages in the Patent Agreement draft may have changed but not the other terms. *See* DeMonico Decl. ¶¶ 5–7, Exs. A–D.

[5] This fact shows that Defendants' claims that Brown has never "traveled to Florida for business purposes related to this case" or "in connection with" his business relationship with BDU are also unequivocally false. *See* Defs. Mot. at 9, 12. Even Brown's declaration on this point is false. He states he made one trip in December 2021 to have dinner with McKnight, but of course he also traveled to Florida in November 2021 for a multi-day business trip with BDU. If not for the discovery permitted by this Court, Defendants' falsehoods would not be known.

under an agreement governed by Florida law, traveled to Gainesville to advance the project, took direction from Florida entity BDU regarding the products' design, prototyping, and marketing, and received payments from Florida based entities and individuals. *See* DeMonico Decl. ¶¶ 5–7, 11–15, 19, 21–23, Exs. A, G, H, J–Q. As previously stated, Florida does not require that a defendant be physically present to "commit a tortious act in Florida," and the state's long-arm statute reaches all participants in a conspiracy when at least one act occurs in Florida. *See Energy Source*, 2011 WL 3236047, at \*6–7; *ECB*, 2025 WL 2471541, at \*3. Thus, Brown's direct and ongoing involvement in a Florida based conspiracy to commit fraud satisfies the requirements of Florida's long-arm statute.

Brown's tortious conduct is also sufficient to establish minimum contacts with Florida. RBT's aiding and abetting fraud claim against Brown arises directly from his Florida-based conduct: his work for Florida-based entities and individuals was governed by a contract that included Florida choice-of-law and arbitration clauses; he personally visited the state to coordinate the development of products that RBT alleges violate the Settlement Agreement; he adhered to Florida-based oversight of the design and prototyping of products that RBT alleges violated the Settlement Agreement; and he received payments from Florida based entities and individuals for this work—all reflecting Brown's deliberate affiliation with Florida. *See ECB*, 2025 WL 2471541, at \*3; *see also Burger King*, 471 U.S. at

475, n.18 ("So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction"); *see also* DeMonico Decl. ¶¶ 5–7, 11–15, 19, 21–23, Exs. A, G, H, J–Q. Indeed, bank records confirm that Brown received money from Defendants into his personal account on at least 12 separate times totaling approximately $122,500. *See* DeMonico Decl. ¶ 19.

Exercising jurisdiction over Brown also accords with "fair play and substantial justice": Florida's interest in adjudicating intentional torts executed through Florida actors is strong; Brown's burden is minimal given modern communications and his business ties to the state; and Florida's connection to the dispute is substantial. *See Energy Source*, 2011 WL 3236047, at *6–7.

As in *Energy Source*, Brown deliberately joined a scheme centered in Florida under an agreement governed by Florida law, received funds routed from Florida, and worked for a Florida company and its principals to perpetrate the fraudulent scheme alleged in the Complaint. *See Energy Source*, 2011 WL 3236047, at *6–7; *see also Madara*, 916 F.2d at 1514 ("[W]here the plaintiff's complaint and the defendant's affidavits conflict, the district court must construe all reasonable inferences in favor of the plaintiff"). These facts establish Brown's minimum contacts with Florida, and show that exercising personal jurisdiction over him comports with "traditional notions of fair play and substantial justice." *See Energy Source*, 2011 WL 3236047, at *6–7.

## B. This Court has personal jurisdiction over Defendant Lea Andreoli.

Likewise, Andreoli's tortious conduct subjects her to the jurisdiction under Florida's long arm statute. The Complaint alleges that she knowingly acted as the payment conduit for a Florida centered scheme by allowing her personal account to receive Brown's proceeds and conceal their true recipient. Compl. ¶¶ 17, 59, 158–63. Limited discovery confirms this: Brown directed BDU's payments to her account and used that account again and again to receive at least three payments from BDU totaling $60,000. *See* DeMonico Decl. ¶¶ 13–18, Exs. H, I. Andreoli's excuse that Brown either had not yet set up a business banking account or had an "[in]convenient" account with USAA carries no weight. Brown *should* have set up a business account for Atrius, unless it was merely an *alter ego*. The argument regarding USAA's inconvenience is also nonsensical—Andreoli was *wired* funds from BDU. *See id.* ¶¶ 13–15, Ex. H. Those funds could just have easily been wired to Brown at USAA, unless he was hiding something.

Andreoli also helped record and transmit short update videos—i.e., recordings of prototype parts and function tests—that Brown sent to BDU in Florida for review. *See* DeMonico Decl. ¶ 17, Ex. I. She also paid business expenses from her personal account on Atrius's behalf. *See id.* ¶ 18.[6] As previously

---

[6] These facts shows that Defendants' claim that Andreoli has "never been involved with [Atrius's] business or business activities" is also unequivocally false. *See*

explained, Florida's long-arm statute reaches all participants in a conspiracy and does not require the conspirators to have entered the state so long as any act in furtherance of the conspiracy occurs in Florida. *See Energy Source*, 2011 WL 3236047, at *6–7; Fla. Stat. § 48.193(1)(a)(2). In short, Brown's effort to conceal his role in BDU's fraudulent scheme based in Florida required Andreoli to receive funds on his behalf, which ties her to Florida. *See* DeMonico Decl. ¶¶ 13–15, Ex. H. As a coconspirator who aided and abetted a fraud centered in Florida, she falls within the statute. *See Energy Source*, 2011 WL 3236047, at *6–7.

Exercising personal jurisdiction over Andreoli also satisfies Due Process. RBT's claim against her for aiding and abetting fraud arises directly from her Florida-connected acts described above: she facilitated payments routed from Florida entities and residents, she assisted Brown in concealing his involvement, she helped create and send the update recordings that those Florida actors used to direct Brown's work, and she paid Atrius business expenses from her personal bank account. *See* ECF No. 1 ¶¶ 17, 59, 158–63; DeMonico Decl. ¶¶ 13–17, Exs. H, I. Those facts show Andreoli's purposeful affiliation with the forum. And while a single tortious act can be enough, *see Burger King*, 471 U.S. at 475 n.18, here,

---

Defs. Mot. at 9, 12; ECF 100-8, Declaration of Lea Andreoli ¶ 13. If not for the discovery permitted by this Court, Defendants' falsehoods would not be known.

Andreoli accepted multiple payments and helped transmit materials into Florida. *See* DeMonico Decl. ¶¶ 13–17, Exs. H, I.

Further, exercising jurisdiction over Andreoli comports with "traditional notions of fair play and substantial justice." As with Brown, Florida has a strong interest in adjudicating intentional torts carried out through Florida channels; the burden on Andreoli is modest given modern communications; and her conduct is directly connected to a conspiracy to commit fraud that is centered in Florida. *See Energy Source*, 2011 WL 3236047, at *6–7. As in *Energy Source*, because Andreoli is a nonresident who channeled funds that advanced a tortious conspiracy based in Florida, she has the requisite minimum contacts to satisfy Due Process, and the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *See Energy Source*, 2011 WL 3236047, at *6 and *7; *see also Madara*, 916 F.2d at 1514. Thus, this Court may exercise personal jurisdiction over Andreoli, in accordance with Florida's long-arm statute and the Due Process Clause.

### C. Defendants fail to show that this Court lacks personal jurisdiction over Brown and Andreoli.

Defendants' motion attempts to manufacture a personal jurisdiction defense by mischaracterizing the allegations in the Complaint entirely. First, they portray the allegations regarding Brown's involvement as all having been made "on information and belief." *See* Defs. Mot. at 10. But Defendants' selective reading

cannot detract from what the Complaint actually states: Brown's involvement is specifically alleged over 11 detailed paragraphs, few of which are made on information and belief. *See* ECF No. 1 ¶¶ 9, 17, 56, 58–65, 76 (only two of these allegations are made on information and belief, and that qualification was added regarding the precise amount of profits Brown made selling infringing products with McKnight and Rios, and the timeline of his involvement).[7] And contrary to Defendants' assertions, the Complaint goes to lengths to describe the "Florida-based" infrastructure that Brown was a part of. *See id*. These allegations are plainly sufficient to establish Brown's minimum contacts with Florida.

Ironically, Defendants' assertion that "any [] allegations that Brown acted through any 'Florida-based infrastructure' are verifiably false"—has *itself* already been verified to be false. *See* Defs. Mot. at 11. Third-party productions confirm the Florida nexus that Defendants deny.[8] *See* DeMonico Decl. ¶¶ 5 –21, Exs. A–O. They show that Brown signed a Florida-governed Patent Agreement with a Florida arbitration clause; flew to Gainesville for a two-day working session; received

---

[7] Defendants acknowledge these allegations eventually, *see* Defs. Mot. at 11, but only after arguing for two-pages from a position that assumes they were not included in the Complaint.

[8] Incredibly,  Defendants assert that Brown's sole connection to Florida was "a personal visit to a friend approximately a year ago," *and* that he was "retained by BDU [a Florida corporation] to assist in developing a forced reset trigger with a three-position selector." *See* Defs. Br. at 9–10, 12.

Florida-directed CAD files, prototypes, and test feedback; transmitted progress videos to BDU, a Florida entity; and routed BDU payments into Andreoli's account. *See id.* This evidence directly contradicts Defendants' assertion and independently corroborates that Brown and Andreoli purposefully availed themselves of Florida through repeated, directed conduct tied to the alleged scheme, which more than satisfies RBT's prima facie showing of specific jurisdiction at this stage.

Regarding Andreoli, defeating Defendants' arguments is rather straightforward: the Complaint alleges (not on information and belief, as Defendants imply) that "[t]o conceal the nature of this transaction [payments from BDU to Brown], Defendants McKnight and Rios routed payments through a bank account held in the name of Brown's wife, Defendant Lea Andreoli." ECF No. 1 ¶ 59 (while this allegation is also made on information and belief in ¶ 17, that in no way detracts from the unqualified allegation in ¶ 59). That is the only substantive allegation regarding her, and as explained above, it is sufficient to establish that she is subject to jurisdiction under Florida's long-arm statute and Due Process. Simply put, Andreoli's concealments of payments in furtherance of a fraudulent enterprise based in Florida is sufficient to establish jurisdiction. Moreover, RBT's discovery to date shows that Andreoli received repeated transfers from BDU into her personal bank account at Brown's direction and helped create and transmit

update recordings back to BDU in Florida. *See* DeMonico Decl. ¶¶ 13–17, Exs. H, I. These Florida-directed acts confirm that she knowingly served as the payment conduit and communications channel for a Florida centered fraud scheme. Further, although Defendants wishfully imply otherwise, Andreoli can be subject to Florida's long-arm statute without ever having set foot in the state, provided that she played a role in a fraudulent conspiracy centered in Florida. *See Energy Source*, 2011 WL 3236047, at *6–*7; *see also* Defs. Mot. at 13–14.[9]

Accordingly, the Court should exercise specific personal jurisdiction over Brown and Andreoli because RBT's allegations, corroborated by limited discovery, show they aided and abetted a Florida centered fraudulent conspiracy, placing them within Florida's long-arm statute and establishing the minimum contacts required by Due Process.

---

[9] Defendants' contention that Andreoli had two payments deposited into her personal bank account because "her husband had not yet opened a business account and used her existing account for convenience," belies credulity (does Brown not have a bank account?) and, unsurprisingly, has already been disproven by RBT's limited discovery, which shows a *minimum* of three payments made to Andreoli's account of at least approximately $60,000. *See* Defs. Mot. at 14; DeMonico Decl. ¶¶ 13–19, Ex. H.

**III.** **Alternatively, Atrius can be dismissed without destroying complete diversity because it is not a party to RBT's breach of contract or fraud claims, and it is a dispensable party with respect to RBT's aiding and abetting fraud claim.**

Federal Rule of Civil Procedure 21 authorizes a district court, "on motion or on its own," to "add or drop a party" and to "sever any claim against a party," "at any time" and "on just terms." Fed. R. Civ. P. 21. The Supreme Court has held that Rule 21 "invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time." *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 832 (1989).

In the Eleventh Circuit, courts routinely use Rule 21 to cure a diversity defect by dismissing a dispensable nondiverse party, provided no unfair prejudice results. *See, e.g.*, *Payroll Mgmt., Inc. v. Lexington Ins. Co.*, 815 F.3d 1293, 1298 n.8 (11th Cir. 2016) (quoting *Newman–Green*, 490 U.S. at 832); *Molinos Valle Del Cibao*, *C. por A. v. Lama*, 633 F.3d 1330, 1343–44 (11th Cir. 2011); *Ingram v. CSX Transp., Inc.*, 146 F.3d 858, 862 (11th Cir. 1998); *see also Luxor Agentes Autonomos de Investimientos, Ltda. v. Intertransfers, Inc.*, 638 F. App'x 925, 927 (11th Cir. 2016).

Rule 19 sets out a two-step framework for deciding whether a party is dispensable under Rule 21. Fed. R. Civ. P. 19; *Plain Bay Sales, LLC v. Gallaher*, No. 9:18-CV-80581-WM, 2020 WL 961847, at *4 (S.D. Fla. Feb. 28, 2020). First, the court determines whether the party is a "required party" under Rule 19(a)(1)—

that is, whether complete relief can be afforded among the existing parties, or whether that party's absence would impair its ability to protect its interest or expose the existing parties to a substantial risk of inconsistent obligations. *See Gallaher*, 2020 WL 961847, at *4 (citations omitted). If the party is not "required" under Rule 19(a)(1), the inquiry ends, and the case may proceed without them. *See Gallaher*, 2020 WL 961847, at *4 (citations omitted).

If the party is "required" and joinder is not feasible, the court then applies Rule 19(b) and decides, "in equity and good conscience," whether the action should proceed without that party or be dismissed. *Id.* (quoting Fed. R. Civ. P. 19(b)). In making this determination, Rule 19(b) directs the court to consider four factors:

> **(1)** the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> **(2)** the extent to which any prejudice could be lessened or avoided by:
> > **(A)** protective provisions in the judgment;
> > **(B)** shaping the relief; or
> > **(C)** other measures;
> **(3)** whether a judgment rendered in the person's absence would be adequate; and
> **(4)** whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

Here, even if Atrius-Idaho is somehow considered a Texas entity, it is a dispensable party because the core claims at issue—breach of the settlement agreement, breach of the implied covenant of good faith and fair dealing, and

fraud—are alleged against the Settlement Agreement's signatories, not Atrius.[10]

The only claim asserted against Atrius is aiding and abetting fraud, which is

analytically and remedially distinct from the contract and fraud claims against the

signatories. Thus, the Court can afford complete relief on the contract-based

disputes and fraud claims solely among RBT and the signatory Defendants. *See*

*Gallaher*, 2020 WL 961847, at *4.

Further, dropping Atrius will not prejudice any party. Dismissing Atrius

would not prejudice RBT and cures any jurisdictional defect should the Court

somehow find Atrius-Idaho a citizen of Texas. *See Newman–Green*, 490 U.S. at

832; *Payroll Mgmt.*, 815 F.3d at 1298 n.8; *Molinos*, 633 F.3d at 1343–44. And

Atrius's absence would neither impair its ability to protect its interests on the

aiding and abetting fraud claim, nor expose the remaining parties to inconsistent

---

[10] While Defendants' argument assumes that the dismissal of Brown and Andreoli for lack of personal jurisdiction could justify dismissal of the entire action, this position is contrary to law. Unlike where an indispensable party's inclusion destroys complete diversity for purposes of subject matter jurisdiction, it is well-established that a court may proceed against remaining defendants despite lacking personal jurisdiction over one. *See, e.g.*, *Doe v. Ejercito De Liberacion Nacional*, No. 15 CV 8652-LTS, 2015 WL 9077344, at *4 (S.D.N.Y. Dec. 16, 2015), *modified in part*, No. 15 CV 8652-LTS, 2016 WL 1073100 (S.D.N.Y. Mar. 10, 2016) ("[A]ny lack of personal jurisdiction over the [] Respondents is not a proper basis for dismissal of this entire action"); *Townsend v. Nat'l Arb. F., Inc.*, 584 F. App'x 664, 665 (9th Cir. 2014) ("The district court dismissed [the plaintiff's] claims against six individual defendants for lack of personal jurisdiction and **permitted the suit to continue against other defendants**" (emphasis added)).

obligations on the contract and fraud claims because those obligations arise from an agreement Atrius did not sign. *See id.*

Moreover, as discussed above, Brown directed the funds that BDU intended to pay Atrius through Andreoli's bank account. *See* DeMonico Decl. ¶¶ 13–19, Ex. H. Thus, the evidence shows that Brown and Andreoli commingled their personal accounts with payments intended for Atrius. Consequently, RBT is confident discovery will continue to show that Atrius functioned as an alter ego of Brown and Andreoli. *See generally*, *Fed. Trade Comm'n v. On Point Glob. LLC*, No. 19-25046-CIV, 2020 WL 1812398, at *2 (S.D. Fla. Apr. 9, 2020) (stating the elements required to establish the alter ego theory). Therefore, should RBT prevail against Brown and Andreoli, it is highly likely that it could recover damages from Atrius in a different forum on grounds that Atrius is Brown and Andreoli's alter ego, which would eliminate the possibility of separate actions addressing the same legal issues.

In their motion, Defendants' misleadingly state that "if a federal court determines at any time that it lacks subject matter jurisdiction, then the court must dismiss the case." *See* Defs. Mot. at 8 (summarizing the holding in *Muhammed v. Corp. Serv. Co.*, No. 3:25CV229/TKW/ZCB, 2025 WL 1298754 (N.D. Fla. Apr. 7, 2025), *report and recommendation adopted*, No. 3:25CV229-TKW-ZCB, 2025 WL 1295016 (N.D. Fla. May 5, 2025)). That statement is true—provided the

nondiverse defendant is the *only* defendant, as was the case in *Muhammed*. *See Muhammed*, 2025 WL 1298754, at *1. The *Muhammed* court did not address the issue of whether a nondiverse party was dispensable. *See id.* Thus, notwithstanding Defendants' reliance, it offers no support whatsoever for their contention that if this Court does not have jurisdiction over Atrius, "the **entire case** must be dismissed." *See* Defs. Mot. at 8 (emphasis original).

Further, Defendants' reliance on *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843 (11th Cir. 1999), is misplaced. *See* Defs. Mot. at 19–20. In *Laker*, the missing third party was the entity officially responsible for running the very system the plaintiffs said was being manipulated; the court could not decide whether that system was lawful without reviewing that entity's decisions and legal authority, so it had to be joined. *Laker*, 182 F.3d at 848–50. Here, Atrius plays no such central, rule setting role. The questions that matter—whether the settling Defendants breached the Settlement Agreement and Consent Judgment and whether they committed fraud—can be decided entirely among the parties already before the Court, and the Court can award complete damages and injunctive relief without making any ruling about Atrius's independent rights or duties. *Laker* itself confirms this approach by allowing other claims by the plaintiff to proceed where the absent party's interests were not implicated and the dispute was essentially bilateral. *Id.* at 850–51. Atrius is an alleged aider and abettor whose involvement is

severable, which does not make it a Rule 19 "required party." *See Gallaher*, 2020 WL 961847, at *4.[11]

*Cuhaci*—another case Defendants invoke—is also inapposite. See Defs. Mot. at 20–21; *Cuhaci v. Echemendia*, No. 20-cv-23950-BLOOM/Louis, 2021 WL 4973722 (S.D. Fla. Oct. 26, 2021). In that case, the absent party signed the contract at the center of the dispute, so the court could not decide the contract's validity without that party. *See id.* at *4–5. Further, a parallel state case against that same party was already pending and could resolve the entire controversy in one proceeding. *See id.* Defendants cite *Cuhaci* to suggest the public interest under Rule 19(b)(2) and (3) favors one forum when a single state action can adjudicate everything. Yet here, Atrius did not sign the Settlement Agreement or the Consent Judgment, and the Court can grant complete relief against the signatories without

---

[11] Defendants' reliance on *City National Bank of Florida v. Louisiana Apple, LLC*, No. 24-cv-23285, 2024 WL 4212910 (S.D. Fla. Sept. 17, 2024), is similarly misplaced. Although *City National* repeats that the first Rule 19(b) factor—prejudice—is "primary" and "nearly dispositive," the court simultaneously reaffirmed that Rule 19(b) requires a practical, case-specific balance of all four factors and asks whether any prejudice would be "immediate and serious" rather than "remote and minor." *Id.* at 4–5 (citing the 1966 Advisory Committee Notes and Wright & Miller). On its own facts, *City National* mitigated potential prejudice by tailoring relief and then held that none of the 19(b) factors warranted dismissal, proceeding without the absent entities. 2024 WL 4212910, at *6. The same is true here: the Court can shape relief to the settlement signatories alone, it need not adjudicate any independent right or duty of Atrius, and any conceivable prejudice to an absent Atrius is, at most, "remote and minor"—which is not a basis for indispensability under Rule 19(b).

deciding any independent right or duty of Atrius. Hence, the efficiency and piecemeal concerns that animated the reasoning of the *Cuhaci* court are not present.

Accordingly, should it be determined that Atrius-Idaho is somehow a citizen of Texas, the Court should drop Atrius as a dispensable party under Rule 21 and allow RBT to proceed against the remaining Defendants.

## IV. In the alternative, the Court can exercise ancillary jurisdiction over Atrius.

Although federal courts are courts of limited jurisdiction, the doctrine of ancillary jurisdiction "recognizes federal courts' jurisdiction over some matters (otherwise beyond their competence) that are incidental to other matters properly before them." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 378 (1994). More specifically, while a federal court does not automatically retain jurisdiction to enforce a settlement agreement in a matter it has previously dismissed, the federal court is the proper forum for litigating a breach of a settlement agreement when the court retains jurisdiction over it or incorporates its terms. *In re Am. Express Fin. Advisors Sec. Litig.,* 672 F.3d 113, 134 (2d Cir. 2011) (quoting *Kokkonen,* 511 U.S. at 381).

While an express contract claim is not currently lodged against Atrius, third-party discovery has revealed that Atrius acted as an agent of BDU Defendants at the time the Settlement Agreement was signed. The Settlement Agreement bound

the parties, including BDU, and "their officers, agents, directors, affiliates, legal representatives, employees, successors, heirs and assigns." ECF No. 1-1 ¶ 22. This term was incorporated into the Consent Judgment and Permanent Injunction. *See* ECF No. 1-2 at 5–6, ¶ 1. This Court can therefore exercise ancillary jurisdiction over Atrius even if it was deemed a Texas citizen because diversity jurisdiction is not required.

## CONCLUSION

For the reasons stated above, RBT respectfully requests that the Court deny the Atrius Defendants' motion to dismiss under Rule 12.

Dated: September 3, 2025

Respectfully submitted,

**DHILLON LAW GROUP, INC.**

By: */s/ Josiah Contarino*
    Josiah Contarino (Admitted PHV)
    Jacob William Roth (Bar No. 1036551)
    Anthony J. Fusaro, Jr. (Admitted PHV)
    1601 Forum Place, Suite 403
    West Palm Beach. FL, 33401
    415-433-1700
    jcontarino@dhillonlaw.com
    jroth@dhillonlaw.com
    afusaro@dhillonlaw.com

**WOOD HERRON & EVANS LLP**

BY: */s/ Glenn D. Bellamy*
    Glenn D. Bellamy
    600 Vine Street, Suite 2800
    Cincinnati. Ohio 45202
    gbellamy@whe-law.com

*Attorneys for Plaintiff*
*Rare Breed Triggers, Inc.*

**Certificate of Word Count**

Pursuant to Northern District of Florida Rule 7.1(F), I hereby certify that the foregoing Brief, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 7389 words as measured by Microsoft Office for Word.

*/s/ Josiah Contarino*
Josiah Contarino

**Certificate of Service**

I certify that on **September 3, 2025**, I filed the foregoing with the Clerk of the Court via CM/ECF. I also certify that the foregoing document is being served this day on all counsel either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Josiah Contarino*
Josiah Contarino

**Defendants' Certificate of Conferral**

Counsel for Defendants certifies that counsel for Plaintiff "advised it would oppose the motion but refused to provide any basis for doing so when explicitly asked." ECF No. 100 at 30. This is unequivocally false. Attached as Exhibit 1 to

this opposition is a copy of the email thread between Josiah Contarino and Adam Floyd, which reflects the following:

On August 19, 2025, Adam Floyd emailed stating his belief that the parties "should jointly move for an administrative stay pending [the Court's] ruling" on arbitration. Ex. 1 at 7. Michael Smith "concur[red]" with Mr. Floyd.

Counsel for Plaintiff, Josiah Contarino, responded:

> Given that Defendants filed multiple motions seeking a stay, it does not surprise me that Defendants still desire that relief. Plaintiff opposed those motions, so it should not surprise you that Plaintiff's position has remained unchanged, as well. Please let me know if you have availability to conduct the Rule 26(f) conference. The deadline to file the Rule 26(f) report is Monday, 8/25/25. Thanks.

Ex. 1 at 5. Mr. Floyd responded by stating Defendants would file an administrative stay, and said "I assume you will oppose?" Ex. 1 at 4. Mr. Floyd then relayed Defendants' intent to file a Rule 12 motion. *Id.* Mr. Contarino indicated Plaintiff's opposition. Ex. 1 at 3. Mr. Floyd sought the basis for the opposition. Ex 1 at 3.

Counsel for Plaintiff, Mr. Contarino, responded:

> As mentioned yesterday, Defendants have already filed multiple motions to stay, and Plaintiff has opposed those motions. While we are not limiting any potential opposition to another motion to stay filed by Defendants, we oppose on the bases we included in those oppositions. As for your anticipated Rule 12 motion, Plaintiff disagrees with your legal position. For example, your position that the court does not "have the power to 'fix' that [subject matter] issue by severing parties or taking any other action" appears patently incorrect. But let me ask you this. When you say that "[w]e were considering subjecting Atrius to the Court's jurisdiction," are you representing that Atrius and the other Defendants will be withdrawing the motions to compel arbitration that

seek to divest the court of jurisdiction? Because, if not, then it would seem less like you are trying to find a way to have the court maintain jurisdiction and more like you want to get out in front of potential arguments against your forthcoming jurisdiction motion. Finally, considering that you intend to have the entire lawsuit dismissed with your Rule 12 motion, the local rule's conference requirement would not apply to it because you intend to file a motion that would determine the outcome of a case or claim.

Ex. 1 at 2.

Mr. Floyd responded:

> No, we believe the Court should stay the case in favor of arbitration. What I meant by we were considering subjecting Atrius to the Court's jurisdiction was letting this Court decide the issue, as opposed to some other court. I don't know what you mean by "looks like you want to get out in front of potential arguments against your forthcoming jurisdiction motion."

> Well, I'm not sure I read the LR requiring no conference as applicable to a Rule 12 motion. A Rule12 motion doesn't determine the "outcome of the case."

> Your current arguments opposing our motion to stay in favor of arbitration don't apply to a Rule 12 motion. I'll just let the Court know you refuse to provide me an explanation.

Ex. 1 at 1–2.

In response to Mr. Floyd's threat, Mr. Contarino stated: "Do as you wish. I'll be sure to attach this entire email chain to Plaintiff's opposition so the court has the full context." Ex. 1 at 1. To which Mr. Floyd replied: "Awesome." *Id.*