UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

| | |
|---|---|
| RARE BREED TRIGGERS, INC., a Texas corporation,<br><br>*Plaintiff*,<br><br>v.<br><br>BIG DADDY ENTERPRISES, INC., et al.<br><br>*Defendants*. | Docket No.: 1:25-cv-00181-RH-MAF |

### DECLARATION OF LAWRENCE DEMONICO

I, Lawrence DeMonico, have personal knowledge of the following facts set forth below, in part based on the records included herein, except for assertions made upon information and belief, and if called as a witness I would testify as follows:

1. I am president of Plaintiff Rare Breed Triggers, Inc. ("RBT"). I am authorized to make this declaration.

2. At the time RBT filed its Complaint, its allegations regarding the citizenship of Defendant Atrius Triggers Group Corp. ("Atrius-Idaho") were based on the information at its disposal based on Atrius-Idaho's conduct between 2021 and 2023.

1

3. Through discovery conducted in this litigation, RBT obtained records from a former employee for Defendants BDU and McKnight named Omar Zumot whose work for Big Daddy Unlimited, Inc. ("BDU") and McKnight included the period of October 2021 through October 2022. These records include text message and email conversations between Zumot and Defendants Malcolm Brown, Douglas Rios, and Anthony McKnight. In addition to reviewing these text messages, I have personally spoken with Zumot about his work with Defendants BDU, McKnight, Rios, and Brown.

4. During the period of October 2021 through September 2022, Zumot was BDU's primary liaison with Brown for his work on various forced reset trigger ("FRT") projects. *See* ECF No. 100-1 ¶ 27.

### I. Brown and BDU entered a business agreement for a co-venture to create an FRT together.

5. Brown's communications with Zumot include a message from Zumot to Brown from November 3, 2021, with a draft agreement for Brown's company, Defendant Atrius Development Group Inc. ("Atrius") and BDU to work together on an FRT. *See* Exhibit A (Draft Patent Agreement).[1] Under the terms of the draft

---

[1] Attached as Exhibit A is a true and correct copy of a draft of the 2021 Patent License Agreement between Malcolm Brown, on behalf of Atrius Development Group Corp., and Anthony McKnight, on behalf of Big Daddy Unlimited, Inc. ("BDU"), produced to RBT in discovery by former BDU employee Omar Zumot.

2

agreement, Atrius would be paid a royalty fee for each FRT unit manufactured and sold by BDU pursuant to the agreement. *Id*. at 2.

6. This draft agreement contained provisions establishing that the agreement was governed by Florida law and that any disputes would be subject to arbitration in Gainesville, Florida. *Id*. at 5-6.

7. Between November 3, 2021, and November 8, 2021, there were several messages between Brown and Zumot referring to the draft agreement and their eagerness to execute it. *See* Exhibit B.[2] The messages mention revisions to the agreement, but the only issue discussed between Zumot and Brown related to the amount of royalties Atrius was set to receive. *See* Exhibit C.[3] Brown conveyed that he wanted royalties as follows: "15% of gross or 25% of profit." *See id.* During this time, Zumot communicated with McKnight about the agreement and the issue he mentioned was the amount of royalties. *See* Exhibit D.[4] There is no indication

---

[2] Attached as Exhibit B are true and correct copies of text messages between Omar Zumot and Malcolm Brown discussing the draft Patent Agreement between Atrius and BDU, produced to RBT in discovery by former BDU employee Omar Zumot.

3 Attached as Exhibit C are true and correct copies of text messages between Omar Zumot and Malcolm Brown discussing revisions to the draft Patent Agreement between Atrius and BDU and the royalties that Atrius was set to receive, produced to RBT in discovery by former BDU employee Omar Zumot.

4 Attached as Exhibit D are true and correct copies of text messages between Omar Zumot and Defendant Anthony McKnight discussing the revisions to the draft Patent Agreement between Atrius and BDU, produced to RBT in discovery by former BDU employee Omar Zumot.

3

that the provisions in the draft agreement Brown received on November 3, 2021, relating to the agreement being governed by Florida law or arbitration taking place in Florida were revised and not included in the final agreement that Brown states in his declaration that Atrius entered with BDU on November 8, 2021. ECF No. 100-1 ¶ 22.

8. By the terms of this draft agreement, Atrius's relationship with BDU was as a co-venturer with entitlement to a share of the revenues for sales of the FRT he was designing with BDU based on the royalty provision.

9. Brown and Zumot repeatedly referred to the relationship between Atrius and BDU on the FRT as a partnership and referred to Atrius and BDU as partners on the project. *See* Exhibit E.[5]

10. Zumot also offered Brown a position on behalf of BDU for Brown to formally join BDU as its head of manufacturing. *See* Exhibit F.[6]

---

[5] Attached as Exhibit E are true and correct copies of text messages between Malcolm Brown and Omar Zumot that refer to the relationship between BDU and Atrius as a "partnership," produced to RBT in discovery by former BDU employee Omar Zumot.

[6] Attached as Exhibit F are true and correct copies of text messages between Malcolm Brown and Omar Zumot where Zumot offered Brown the role of head of manufacturing for BDU, produced to RBT in discovery by former BDU employee Omar Zumot.

## II. Brown traveled to Florida for business to visit BDU related to designing an FRT in November 2021.

11.  Zumot's communications with Brown reflect that he traveled to Florida for business with BDU related to the FRT he was designing with BDU between November 29-30, 2021. *See* Exhibit G.[7] Zumot and Brown discussed and planned the trip for weeks, including how Brown would see BDU's facility, meet the team, and discuss their business venture of designing an FRT. *See id.* The communications indicate that BDU arranged and paid for Brown's travel. *See id.*

12.  Brown's communications with Zumot also reflect that Brown has a sister who lives near Jacksonville, Florida that he is on good enough terms with to stay at her house and be driven around by her husband while visiting BDU. *See id.*

## III. Atrius received at least three payments from BDU through Lea Andreoli's bank account and Andreoli knew of Brown's use of her account for Atrius business with BDU, and Atrius received at least 12 payments from Performance Triggers through Brown's bank account.

13.  In November 2021, Brown specifically directed McKnight and Zumot to have payments to Atrius sent to the personal bank account of Brown's wife, Lea Andreoli. *See* Exhibit H.[8] Brown coordinated with Zumot to have payments sent to

---

[7] Attached as Exhibit G are true and correct copies of text messages between Malcolm Brown and Omar Zumot that discuss Brown's trip to Florida for business with BDU related to the FRT he was designing for it, produced to RBT in discovery by former BDU employee Omar Zumot.

[8] Attached as Exhibit H are true and correct copies of text messages between Malcolm Brown and Omar Zumot discussing BDU's payments to Atrius that were

Atrius through Andreoli's personal account in December 2021, January 2022, February 2022, and March 2022. *See id.* On March 3, 2022, Brown confirmed to Zumot again that Andreoli's account was the correct account for BDU to send payments to for Atrius. *See id.*

14. Specifically, Andreoli received at least three deposits into her personal account from Big Daddy Unlimited Inc. totaling $60,000.

15. Brown's communications with Zumot indicate that BDU sent payments to Atrius through Andreoli's account with Andreoli's knowledge and involvement, as Brown told Zumot in March 2022 that he would have Andreoli check her account to confirm a wire transfer for Atrius sent to it had been received. *See* Exhibit H.

16. In addition to these communications and records reflecting that Brown had BDU pay Atrius through Andreoli's personal account, RBT has obtained financial records confirming multiple wire transfers sent to Andreoli's account for Atrius, totaling at least approximately $60,000:

- On December 3, 2021, BDU wired $20,000 to Andreoli's account with Chase Bank.

---

sent to the personal bank account of Lea Andreoli, produced to RBT in discovery by former BDU employee Omar Zumot.

- On January 2, 2022, BDU wired another $20,000 to Andreoli's account with Chase Bank.

- On March 3, 2022, BDU again wired $20,000 to Andreoli's account with Chase Bank.

17. Additionally, as indicated by Brown's communications with Zumot, Andreoli was involved in Brown's work through filming video content of Brown demonstrating his prototype design and its function for Zumot and BDU. *See* Exhibit I.[9]

18. On February 2, 2022, Andreoli also issued a check for $750.00 from her personal Chase Bank account, with the memo stating, "Atrius Inv. 21-007."

19. RBT has also obtained financial records confirming at least 12 wire transfers sent to Brown's personal account for Atrius, totaling at least approximately $122,500:

- On January 2, 2024, $20,000 from Performance Triggers Inc. to Brown;

- On January 3, 2024, $30,000 from Performance Triggers Inc. to Brown;

---

[9] Attached as Exhibit I are true and correct copies of text messages between Omar Zumot and Malcolm Brown discussing Lea Andreoli filming video content of Brown demonstrating his prototype design and its function for Zumot and BDU, produced to RBT in discovery by former BDU employee Omar Zumot.

7

- On March 28, 2024, $20,000 from Performance Triggers Inc. to Brown;

- On August 2, 2024, $5,625 from Performance Triggers Inc. to Brown;

- On August 14, 2024, $5,625 from Performance Triggers Inc. to Brown;

- On August 23, 2024, $5,625 from Performance Triggers Inc. to Brown;

- On September 3, 2024, $5,625 from Performance Triggers Inc. to Brown;

- On October 15, 2024, $5,625 from Performance Triggers Inc. to Brown;

- On October 22, 2024, $5,625 from Performance Triggers Inc. to Brown;

- On October 30, 2024, $5,625 from Performance Triggers Inc. to Brown;

- On November 20, 2024, $5,625 from Performance Triggers Inc. to Brown;

- On December 6, 2024, $5,625 from Performance Triggers Inc. to Brown.

### IV. BDU was directly and closely involved in Brown's design and development of the ART.

20. Brown's communications with Zumot indicate that BDU, primarily through Zumot, was closely involved in Brown's design and development of the ART pursuant to their partnership.

21. Zumot was in regular contact with Brown regarding the design of the trigger. Zumot sent Brown CAD files for the WOT and samples of the WOT and Alamo-15 to work from in designing the ART. *See* Exhibit J.[10] Zumot sent Brown feedback from BDU's team, including from Rios, on elements of the design and gave Brown instructions on the design—including specific direction to include a rolling-bar. *See* Exhibit K.[11] Brown directly solicited McKnight's thoughts and feedback on the design from Zumot. *See* Exhibit L.[12] Brown regularly sent videos

---

[10] Attached as Exhibit J are true and correct copies of text messages between Malcolm Brown and Omar Zumot in which Zumot sent Brown CAD files for the WOT and samples of the WOT and Alamo-15 to work from in designing the ART, produced to RBT in discovery by former BDU employee Omar Zumot.

[11] Attached as Exhibit K are true and correct copies of text messages between Malcolm Brown and Omar Zumot in which Zumot sent Brown feedback from BDU's team, including from Defendant Douglas Rios, on elements of the design and gave Brown instructions on the design—including specific direction to include a rolling-bar, produced to RBT in discovery by former BDU employee Omar Zumot.

[12] Attached as Exhibit L are true and correct copies of text messages between Malcolm Brown and Omar Zumot in which Brown directly solicited McKnight's thoughts and feedback on the design from Zumot, produced to RBT in discovery by former BDU employee Omar Zumot.

of his work and ideas to Zumot for feedback and updates. *See* Exhibit M.[13] Brown sent an update on his work to Zumot and McKnight in a group text. *See* Exhibit N.[14] Zumot and Brown worked together on getting prototypes designed and manufactured and Brown had Zumot 3D print components and test them to give feedback. *See* Exhibit O.[15]

22. Brown's communications with Zumot indicate that Brown's close work with BDU on the ART continued past the date of the Settlement Agreement and until at least a week before the Permanent Injunction was entered. As of October 11, 2022, Brown was still communicating with Zumot regarding design elements of the ART. *See* Exhibit P.[16]

---

[13] Attached as Exhibit M are true and correct copies of text messages between Malcolm Brown and Omar Zumot in which Brown sends videos to Zumot and BDU that document his progress, produced to RBT in discovery by former BDU employee Omar Zumot.

[14] Attached as Exhibit N are true and correct copies of a group text message including Malcolm Brown, Anthony McKnight, and Omar Zumot, in which Brown sent an update on his work to Zumot and McKnight, produced to RBT in discovery by former BDU employee Omar Zumot.

[15] Attached as Exhibit O are true and correct copies of text messages between Malcolm Brown and Omar Zumot in which they collaborate on prototypes and Brown sends Zumot 3D print components to test them and give feedback, produced to RBT in discovery by former BDU employee Omar Zumot.

[16] Attached as Exhibit P are true and correct copies of text messages between Malcolm Brown and Omar Zumot that show Brown communicating with Zumot regarding design elements of the ART in October 11, 2022, produced to RBT in discovery by former BDU employee Omar Zumot.

### V.     Brown knew that his business arrangement with BDU was untoward.

23.    As indicated by Brown's communications with Zumot, Brown was aware that his development of various FRTs with BDU was legally fraught and required some form of subterfuge between Atrius and BDU. *See* Exhibit Q.[17]



---

[17] Attached as Exhibit Q are true and correct copies of text messages between Malcolm Brown and Omar Zumot that show Brown was aware that his development of the ART with BDU was legally fraught and required some form of subterfuge between Atrius and BDU, produced to RBT in discovery by former BDU employee Omar Zumot.

11

24. This table highlights some of Brown and Andreoli's representations that are directly contradicted by documentary evidence:

| | | |
|---|---|---|
| A | "My only contact with Florida was two trips to BDU which is detailed below." Brown Decl. ¶ 7.<br><br>"I have not engaged in any conduct in Florida, giving rise to the claims in this case." Brown Decl. ¶ 9.<br><br>"In December 2021, I visited Mr. McKnight just to meet him in person, and we had dinner together." Brown Decl. ¶ 25. | In fact, Brown arrived in Florida around 10PM on November 27, 2021 and left around on November 30, 2021. *See* Exhibit R. BDU paid for Brown's hotel on Monday, November 29, 2021 to accommodate a late night dinner with the BDU "team." *See id.* Brown planned to bring a prototype that inserting three parts he designed into the WOTs that BDU sent to Brown. *See id.* Brown arrived at BDU headquarters around 2PM on November 29 for a 3PM meeting with the BDU team. After the business trip Brown told Zumot that he was "stoked for our partnership." *See id.* |
| B | "I have not purposefully availed myself of the privilege of conducting activities in Florida, nor have I invoked the benefits or protections of Florida law." Brown Decl. ¶ 8. | The Patent License Agreement, a version of which appears have been executed on November 8, 2021, *see* Brown Decl. ¶ 22, states the it is "governed in accordance with the substantive laws of the State of Florida," and that binding arbitration under the AAA was required "in Gainesville, Alachua County, Florida," *See* Ex. A, §§ 13, 12. |
| C | "As part of the agreement, Atrius–Idaho warrants that its design will not infringe upon someone else's patent." Brown Decl. ¶ 23. | The Patent License Agreement, a version of which appears have been executed on November 8, 2021, *see* Brown Decl. ¶ 22, states that Atrius-Idaho was not aware of infringement but "does not otherwise warrant or guarantee the validity of the Patent Rights or that the INVENTION does not infringe any valid and subsisting |

|   |   | patent or other rights not held by the LICENSOR," *See* Ex. A § 6.1(e). |
|---|---|---|
| D | "For my trigger design work and subsequent patent license, BDU sent Atrius–Idaho a payment in March 2022 to my wife's bank account, as I had not yet set up a business account for Atrius–Idaho." Brown Decl. ¶ 24. | Bank records confirm that:<br>--BDU sent payment of $20,000 to Andreoli on December 3, 2021;<br>--BDU sent payment of $20,000 to Andreoli on January 1, 2022;<br>--BDU sent payment of $20,000 to Andreoli on March 3, 2022. *See* ¶ 16. |
| E | "My design ultimately was *not* a FRT, rather it was an assisted reset trigger ("ART"); this was one of the design elements I incorporated to avoid the '223 patent. The '223 patent requires the bolt carrier reset the trigger fully." Decl. ¶ 27. | As early as October 29, 2021, Brown texts Zumot saying he needs "all the parts disassembled except the trigger and hammer. That way I can just drop in my parts and throw it in my AR asap." *See* Exhibit S. On November 5, 2021, Brown texts Zumot that his "forced reset trigger was relatively easy." *See id.* On November 8, Zumot informs Brown that "Triggers should be arriving Wednesday." *See id.* On November 10, Brown texts Zumot that Brown "made the CAD just based off taking a caliber to the WOT," and that everything is the same as the WOT except the "trigger member, disconnector and hammer." *See id.* Brown confirmed for Zumot that "all three parts" would need to be sent to BDU's manufacturer "to work with the WOT parts." *See id.* Brown designed BDU's 3-position WOT and under the Patent License Agreement received a royalty of $75 per unit. *See id.* A month after Brown gives BDU the CAD files, Doug Rios and Zumot are discussing a plan to develop a WOT kit for the 2-position WOT ("Selektor Fire"). *See id.* Rios and Zumot were also planning to sell a new 3-position WOT, the Selektor: |

13



Defendants later sells the Selektor, and Atrius later sells the Super Selektor, which Performance Triggers then also sold.

In February 2022, Brown texts Zumot:



The quotes around "sell them to BDU" indicates that the 3-position WOTs that

| | | Brown designed and was paid a royalty for were not his to sell because, as the Patent License Agreement states, BDU owned them.<br><br>The 3-position WOT was machined around March 2022. *See id.* In March 2022, Brown sent Zumot a photo of the 3-position WOT and said he would be testing at the range tomorrow. *See id.* In March 2022, Brown sent Zumot and McKnight a photo of a 3-position WOT next to a 2-position WOT. *See id.* |
|---|---|---|
| F | "I made the decision to move forward with the trigger design and manufacture it myself, as I felt uneasy about depending on BDU for funding." Brown Decl. ¶ 29.<br><br>"The ART does not infringe the '223 patent nor is it substantially similar to the Alamo-15 or WOT triggers." Brown Decl. ¶ 57. | On June 12, 2022, Brown advises that while waiting on the WOT 3-position trigger, he "started working on the other trigger" (*i.e.*, the "ART"). *See* Exhibit T. Brown was excited when Zumot told him to use the Graves Rolling locking bar, exclaiming, "Dude yes!" *See* Ex. S. This was based off the Graves' Alamo-15, the CAD file for which Brown obtained from BDU in March 2022. *See id.* Brown received the machined parts for the ART prototype at the end of June 2022. *See id.* Brown received the ART prototype in August 4, 2022, sending a photo of it Zumot. *See* Ex. T. |
| G | In July 2023 "I first met Mr. Rios, but his role at BDU wasn't clear to me," although "[w]e did discuss our business plan." Brown Decl. ¶ 34. | After Brown sent CAD files to Zumot, Doug Rios and Zumot are planning to develop a WOT kit for the "selektor Fire." *See* Exhibit U. On December 13, 2021, Rios sent Zumot a "wot2.pdf" PDF, which was the planned advertisement for the Selektor Triggers. *See id.* Zumot and Rios joked |

15

| | | |
|---|---|---|
| | | about the "Proudly American" label because it was not to be made in America. *See id.* |
| H | "My wife, Lea Brown, who's maiden name is Andreoli, was a registered nurse and now a stay at home mom. She has never been involved with my business or business activities." Brown Decl. ¶ 53.<br><br>"I worked as a registered nurse and now as a stay-at-home mom. I have never been involved with my husband's business or business activities, nor do I have any knowledge thereof, other than a general understanding of what he does." Andreoli Decl. ¶ 13. | Bank records confirm that:<br>--BDU sent payment of $20,000 to Andreoli on December 3, 2021;<br>--BDU sent payment of $20,000 to Andreoli on January 1, 2022;<br>--BDU sent payment of $20,000 to Andreoli on March 3, 2022.<br>Bank records also confirm that Andreoli paid expenses on Atrius's behalf. *See* ¶ 17. |
| I | "One of the two payments that went to my wife's account was from BDU, the other was wholly unrelated to BDU." Brown Decl. ¶ 54. | Bank records confirm that:<br>--BDU sent payment of $20,000 to Andreoli on December 3, 2021;<br>--BDU sent payment of $20,000 to Andreoli on January 1, 2022;<br>--BDU sent payment of $20,000 to Andreoli on March 3, 2022. *See* ¶ 16. |

| | | |
|---|---|---|
| J | "RB falsely claims that Atrius advertised the ART as an FRT. . . . First, the fact that the ART is not an FRT, is in the very name of the product, it is an Assisted Reset Trigger. Second, Atrius never marketed the ART as an FRT; it was always marketed as an ART, lacking full trigger reset." | Atrius advertised the ART's ability to "fine-tune the *elimination* of trigger reset." ECF No. 3-5 ¶ 43. The adjustment screw was not to avoid RBT's patent, but to stay out of the ATF's crosshairs. Once SCOTUS rule on bump-stocks, Brown wrote:<br><br>5:44<br>♡ 185  Q 12  ▽ 61<br>**atriustriggers** It's been a wild ride but due to the Supreme Court victory in July, we will be simplifying our product and coming out with our 3 position Forced Reset Trigger.<br><br>We removed the screw and revised some components which will be backwards compatible with previously purchased Assisted reset triggers. If you purchased a trigger through our website directly, we will provide you the new revised parts at no cost. If you purchased through a distributor or third party we will sell you the part at our cost. Given the issues many people have had with the current iteration of the trigger we feel that we owe it to you guys to try out this new design that feels much better and doesn't require any adjusting at all.<br>Standby this week for more content coming out showcasing the new Atrius 3 position FRT that we will be releasing end of year and feel free to reach out if you have any questions. We have been pretty busy getting this FRT dialed in with revision after revision but the final |

///

///

///

17

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on September 3, 2025.

By: _____
Lawrence DeMonico
President of Rare Breed Triggers, Inc., Owner of LAD, LLC, member of ABC IP, LLC

4911-9073-6485, v. 2